**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARQUES LINDSAY, | : | PRISONER CASE NO. |
| Plaintiff, | : | 3:19-cv-751 (JCH) |
| | : | |
| v. | : | |
| | : | |
| SEMPLE, et al., | : | |
| Defendants. | : | JULY 22, 2019 |
| | : | |
| | : | |

**INITIAL REVIEW ORDER**

## I.    INTRODUCTION

The plaintiff, Marques Lindsay[1] ("Lindsay"), incarcerated at the MacDougall-Walker Correctional Center in Suffield, Connecticut, has filed a Complaint (Doc. No. 1) pro se under section 1983 of title 42 of the United States Code.  Lindsay sought leave to proceed in forma pauperis.  (Doc. No. 2).  On May 22, 2019, the court granted Lindsay's application.  (Doc. No. 6).

The Complaint names six defendants in the caption: 1) former Commissioner Semple, 2) Commissioner Cook, 3) Director of Offender Classification and Population Management Miaga, 4) Director of Security Santiago, 5) Counselor Supervisor Crandall, and 6) Security Risk Group Coordinator Aldi.  Within the body of the

_____

[1] Although the plaintiff signed the Complaint as Marques Lindsay, Department of Correction records show that he was admitted as Marques Lindsey.  He was admitted to custody on October 9, 2018.  He was sentenced on December 10, 2018, to a one-year term of imprisonment. He is scheduled to be released on October 8, 2019. Inmate Information, Connecticut State Department of Correction, www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=331390 (last visited July 16, 2019).  The court will use the spelling in the Complaint.

Complaint, Lindsay includes an additional sixteen defendants: 1) Intelligence Officer Gargano, 2) Security Risk Group Lieutenant Parnishkul, 2) Security Risk Group Lieutenant Kelly, 3) Lieutenant Bragdon, 4) Disciplinary Report Investigator Dousis, 5) Restrictive Housing Unit Manager Cronin, 6) Correctional Officer Messier, 7) Lieutenant Stadalnik, 8) Correctional Officer Greene, 9) Correctional Officer Fiore, 10) Lieutenant Michaud, 11) Registered Nurse Brennan, 12) Doctor Yesu, 13) Deputy Warden Carlos, 14) Deputy Warden Cotta, 15) Warden Faucher, and 16) Security Risk Group Coordinator Papoosha. Compl. at 3-7. All defendants are named in their individual and official capacities. Lindsay seeks monetary, compensatory, and punitive damages against the defendants in their individual and official capacities as well as an injunction directing the defendants to remove him from Security Risk Group ("SRG") programming and place him in "a general population facility of mental health." Compl. at 47-48.

Under section 1915A of title 28 of the United States Code, the court must review prisoner civil complaints and dismiss any portion of a complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. In reviewing a pro se complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[ ]." Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007). Although detailed allegations are not required, a complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right

to relief.  Bell Atlantic v. Twombly, 550 U.S. 544, 555–56 (2007).  Conclusory

allegations are not sufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The plaintiff

must plead "enough facts to state a claim to relief that is plausible on its face."

Twombly, 550 U.S. at 570.  Nevertheless, it is well-established that "[p]ro se

complaints 'must be construed liberally and interpreted to raise the strongest

arguments that they suggest.'"  Sykes v. Bank of Am., 723 F.3d 399, 403 (2d Cir.

2013) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir.

2006)); see also Tracy v. Freshwater, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing

special rules of solicitude for pro se litigants).  However, notwithstanding this liberal

interpretation, a pro se complaint will not survive dismissal unless the factual

allegations meet the plausibility standard.  See, e.g., Fowlkes v. Ironworkers Local 40,

790 F.3d 378, 387 (2d Cir. 2015).

## II.  ALLEGATIONS

On February 2, 2016, Lindsay was discharged from the SRG unit of the

Department of Correction.  Compl. at 8 ¶ 33.  On October 9, 2018, Lindsay was

readmitted to custody and processed as a pretrial detainee.  During intake processing,

Officer Gargano consulted computer records and asked Lindsay if he was still a

member of the SRG Bloods.  Lindsay said no.  Officer Gargano told Lindsay that he

would be going to a segregated housing unit.  When Lindsay questioned why he was

being punished when he had changed his life and had received no new disciplinary

reports, he was ignored.  Id. ¶ 34.

That evening, Lieutenant Parnishkul escorted Lindsay to a segregated housing

unit.  He was directed to remove his clothing, bend at the waist, spread his buttocks,

and cough.  After the strip search, Lindsay was placed in a cell.  Id. ¶ 35.  About an hour later, a restrictive housing unit status order was slipped under Lindsay's cell door. The notice stated that, because Lindsay was designated a member of the SRG Bloods, his continued presence in general population posed a serious threat to the safety and security of the facility.  Id. at 9 ¶ 36.

Lindsay's intake occurred at Bridgeport Correctional Center ("Bridgeport").  Id. ¶ 37.  Lindsay argues that his placement in segregation violates Administrative Directive 9.5, Section 43 which provides that once an inmate is discharged, any penalties or sanctions will not resume if he is reincarcerated.  Id. ¶ 38.

On October 10, 2018, Lindsay was required to use shower shoes belonging to the housing unit to take a shower.  Because he was in a segregated unit, he was unable to purchase his own shower shoes from the commissary.  Id. ¶ 39.  Lindsay also was handcuffed while going to and from the shower even though he had not been found guilty of a criminal charge or been issued a disciplinary report.  Id. ¶ 40. Lindsay was handcuffed and shackled everywhere he went in the facility.  Id. ¶ 41.

Lindsay wanted to use the inmate telephone.  In the evening of October 10, 2018, he submitted an inmate request to Counselor Guyers asking for an inmate PIN number.  Id. ¶ 42.  The following morning Lindsay questioned Counselor Guyers about his request.  She told him that inmates in the Restrictive Housing Unit ("RHU") were permitted phone calls on Thursdays and that they were given three showers per week. Counselor Guyers told Lindsay that he had to be careful because he would be handcuffed while walking to and using the phone.  Lindsay submitted inmate request

4

forms to Officer Gargano and Lieutenant Parnishkul and then grievances to try to resolve his perceived punishment.  Id. ¶ 43.

On November 8, 2018, Lindsay was transferred to the SRG program at Corrigan-Radgowski Correctional Institution ("Corrigan").  He was readmitted as a Blood member and denied a ninety-day review.  Id. ¶ 44.  While at Bridgeport, Lindsay did not meet with the facility Intelligence Coordinator and did not receive notification of the revival of his SRG file or notification of the results of a review.  The only form he received notified him that he was on administrative detention status pending transfer. Lindsay considers the failure to provided appropriate documentation a due process failure resulting in an atypical and significant hardship.  Id. ¶ 45.

Lindsay informed the transport officers that he would have a better chance to prepare for his criminal case or post bond if he remained at Bridgeport.  The officer threated disciplinary action which would result in sanctions and suspension of Lindsay's phone privileges, thereby impeding Lindsay's ability to prepare his case or post bond.  Lindsay complied with the transport to Corrigan even though he knew that the facility to which he was going had no law library and phone calls would be restricted.  Id. ¶ 46.

Upon entering his cell in the Corrigan RHU SRG unit, Lindsay wrote to Lieutenant Kelly asking why he was assigned to SRG housing and complaining about the coldness of his cell.  Id. ¶ 47.

The following evening, Lindsay attended recreation.  He was given state-issued shower shoes.  The drain in the shower was clogged, so Lindsay had to shower while

standing in a puddle of dirty water. He was required to shower, call loved ones, and contact the unit counselor all in one hour. Upon returning to his cell, Lindsay submitted a second request to Lieutenant Kelly about the temperature in his cell. The cold temperature caused Lindsay to shiver and prevented him from falling asleep. During the night, Lindsay wrote to the mental health unit seeking medication for psychiatric reasons and an anti-depressant. Id. ¶ 48.

On November 15, 2018, Lindsay left his cell for court. When he returned to Corrigan that evening, he had been sentenced and was no longer a pretrial detainee. Lindsay was housed in the same cell among sentenced inmates both before and after he was sentenced. Id. ¶ 49.

During the night of November 29, 2018, while all inmates were in their cells, an unidentified member of the Bloods spoke to Lindsay through the ventilation system. The voice told Lindsay that he should "pack [his] belongings and leave" because the Bloods knew that Lindsay had been assaulted by many subsets of the Bloods. The voice explained that they needed "to get in tough with higher-ups who ordered [Lindsay] murdered," and then said, "We'll get you again." The voice told Lindsay that Lindsay had "disrespected beyond repair" and that he would be "jumped and stabbed by a member" serving a long sentence. Lindsay believes that this conversation explained why he was permitted to use the Bloods-only telephone even though he was not a Blood and why Blood members followed him around and stayed close to him. The voice also cautioned Lindsay that, if he left the housing unit, they would

send word to his new housing unit. Lindsay told the voice that he would remain in the housing unit. He was unable to sleep that night. Id. ¶ 50.

The following morning, Lindsay went to court. Upon his return that evening he spoke with Lieutenant Bragdon and requested placement in protective custody. Lindsay stated: "The Unit is too hot for me. My Name is Loud on the hit list. I need to clear my head." Lindsay was sent to RHU and placed on administrative detention status. A few hours later, he received a disciplinary report for refusing housing. Lieutenant Bragdon states in the report that Lindsay had said, "I'm not going back to the unit. The Unit is too loud, and I need to clear my head." Lindsay submitted an inmate request to Lieutenant Kelly stating that he had requested protective custody placement and that the Lieutenant Bragdon had included false statements in the disciplinary report. Id. ¶ 51.

On December 4, 2018, disciplinary investigator Dousis asked Lindsay if he was going to sign the disciplinary ticket. Lindsay told her that he had not refused housing but rather had requested protective custody placement. Lieutenant Bragdon had twisted his safety request to support the charge. Lindsay said that he wanted to be transferred to a facility with less aggressive inmates where he would not be threatened. Lindsay told Dousis that, before he was incarcerated, he had been assaulted by four different subsets of the Bloods. Following the assault, he experienced a seizure and awoke in Bridgeport Hospital. He suffered a brain aneurism, vision damage, long-term memory loss, as well as bruises and contusions.

Dousis encouraged Lindsay to sign the ticket if he wanted safety. Lindsay did so. Id. ¶ 52.

That night, Lindsay submitted two inmate requests to Lieutenant Kelly. In the first request, he wrote about his assault and seizure in the community on September 28, 2018, and explained that this was the sole reason for his seeking protective custody and a less restrictive facility. In the second request, Lindsay included information about the threat he received in prison. He also identified the persons who attacked him in the community, who the attackers were connected to in Corrigan, and which inmates talked to the outside sources. He identified who wanted to hurt him and who wanted to stab him. Id. ¶ 53.

The morning of December 5, 2018, Lindsay went to the RHU showers. He did not see the personal shower slippers that Corrigan had issued him, and so used recycled shower slippers. The water was freezing. Lindsay complained to Unit Manager Cronin about being housed in a cold cell after a freezing shower. Id. ¶ 54.

On December 6, 2018, Lindsay met with Lieutenant Kelly. Lindsay described the recent threat and explained his reasons for seeking protective custody. He told Lieutenant Kelly that his injuries from the prior assault prevented him from being able to defend himself if he was assaulted again. Lieutenant Kelly persuaded Lindsay to remain at Corrigan and transfer to a different housing unit. Id. ¶ 55. That evening, Lindsay felt paranoid and experienced feelings of suicide and homicide. He wrote to the mental health unit seeking medication. Id. ¶ 56.

On December 7, 2018, Lindsay moved from echo-unit to bravo-unit. Upon entering his cell, his cellmate asked what gang he belonged to. Lindsay said that he was not a gang member. His cellmate told him that they would be having recreation next. Lindsay was unable to take a shower because there were no state-issued shower shoes in his property bag. When Lindsay tried to use the phone, Blood members told him he could not use their phone but had to use the neutral phone. However, an inmate interceded and permitted Lindsay to use the Blood phone because the neutral phones were already being used. Lindsay used the phone for the entire hour of recreation. Lindsay understood that the Bloods in bravo-unit knew that he had refused to be "friendly extorted" in the community, i.e., had refused to contribute money that was used to financially assist Blood members and their families. Id. ¶ 57.

Later that night, the inmate in the cell next to Lindsay told him that he should pack his property and leave the unit. The inmate told Lindsay, "you are a plate, you are to be [e]aten," "you disobeyed your end of the deal." The voice sounded like the inmate who had permitted Lindsay to use the phone. The inmate told Lindsay that he would be "eaten" when the doors opened for recreation the next day. That night, however, inmates in the unit were involved in an altercation with the extraction team and the unit was put on lockdown. Id. ¶ 58.

Lindsay was scheduled to go to court on December 10, 2018. Upon his return to Corrigan, Lindsay told Officer Messier that the Bloods in both housing units wanted to harm him and that Lieutenant Kelly had disregarded his plea for safety. Lindsay

told Officer Messier that he wanted to be placed in protective custody as soon as possible. Officer Messier told Lindsay that he was going to get a disciplinary report for refusing housing. Lindsay replied that he was not refusing housing and asked that a lieutenant be called. Id. ¶ 59.

Lieutenant Stadalnik arrived soon after to escort Lindsay to RHU. Lindsay felt safe in RHU even though he had to use communal shower shoes and the water and air temperatures were cold. Lieutenant Stadalnik delivered the disciplinary report but no restrictive housing unit status report telling Lindsay what his status was. Lindsay told Lieutenant Stadalnik that he was seeking safety not refusing housing, but Lieutenant Stadalnik just walked off. Id. ¶ 60.

On December 11, 2018, a week after his first request, Lindsay submitted a request for mental health treatment. He stated that his mother had died and his friend had committed suicide. He requested medication and noted that he had been on different medication in the community. Id. ¶ 61. On December 13, 2018, Nurse Brennan returned Lindsay's mental health requests dated November 10, 2018, and December 11, 2018. Regarding the November request, Nurse Brennan stated that she was unable to renew medications that were not current. Regarding the December request, Nurse Brennan asked Lindsay to list his current medications and identify the pharmacy he used, and also to identify where in New Haven he had been receiving mental health therapy. Lindsay states that he had included this information in his request. Id. ¶ 62.

On December 14, 2018, Dr. Yesu toured the housing unit. Lindsay stopped Dr. Yesu as he passed the cell door. Lindsay described the injuries from the assault in the community and stated that RHU and the threats he has received affected his mental health. Lindsay stated that he knew who had ordered the assault but not the identities of the persons who attacked him. He also stated that the mental health unit was aware that he was hearing voices in his head, but it had not provided medication to treat this condition. Id. ¶ 63.

That afternoon, Lindsay was brought to a confidential area in the RHU to speak with Lieutenant Kelly. He was handcuffed to a chair that was bolted to the floor. Lindsay told Lieutenant Kelly that he could not remain in echo-unit or bravo-unit. He stated that he was not supposed to be in RHU at any time since his readmission. Lindsay stated that he would submit a written request with all pertinent details to show why he needed safety measures. Id. ¶ 64.

On December 16, 2018, Lindsay prepared his request for protective custody and sent it to Lieutenant Kelly. In the request, plaintiff recounted the facts of his assault in the community and explained that he had been threatened to leave both echo-unit and bravo-unit. Id. ¶ 65. The next day, Lindsay had completed his punitive segregation sanction. Office Mehmet told him that he would shortly be returned to one of the two gang units. Lindsay asked Officer Mehmet to contact Lieutenant Kelly. Id. ¶ 66.

A short time later, Officer Mehmet told Lindsay that Lieutenant Kelly had denied protective custody. Officer Mehmet brought Lindsay to the showers where he saw

Lieutenant Dumas. Lindsay spoke to Lieutenant Dumas about his need for protective custody. Lieutenant Dumas said he would handle the situation. Id. ¶ 67.

That afternoon Officer Mehmet told Lindsay that it was Lieutenant Kelly's decision whether he should go to protective custody. Lindsay could refuse housing or go to one of the SRG units. Lindsay refused housing. Id. ¶ 68.

On December 18, 2018, at 8:15 a.m., Disciplinary Investigator Dousis tried to get Lindsay to sign the disciplinary ticket. Lindsay refused. Dousis said that she knew Lindsay's past, and he did not want protective custody. Lindsay said that he had changed. Id. ¶ 69. At about 9:00 a.m., Lindsay was returned to the confidential setting where he had met with Lieutenant Kelly before. Lieutenant Kelly had a protective custody packet and again asked Lindsay why he wanted to go to protective custody. Lindsay described the September 28, 2018 assault in the community and the resulting injuries. He stated that he still had "blood in his brain" and was dizzy. He would be unable to defend himself in an assault. Lindsay also described the threats/warning he received through the ventilation system. Lindsay said that he had changed housing units in accordance with Lieutenant Kelly's suggestion, but the threats had followed him. Although Protective Management Directive 9.9 requires staff to complete a CN9901 Request for Protective Custody and have the inmate sign it, Lindsay "did not view the protective custody packet up close enough to have signed" the request that Lieutenant Kelly produced during their conversation. Lieutenant Kelly said that the interview was over and that they would meet again the next day. Id. ¶ 70. Lindsay did not receive a restrictive housing unit status order. Id. ¶ 71.

On December 28, 2018, Lindsay experienced a burning and itching sensation on his feet.  He thought it might be dry skin.  Id. ¶ 72.  About 4:45 p.m., Lindsay was on his bunk wrapped in his sheet and blanket when Officer Fiori arrived at Lindsay's cell for garbage call.  Officer Fiori said that Lindsay was taking too long in getting down from the bunk and retrieving his trash.  Officer Fiori slammed the trap on Lindsay's hand as he was placing a Styrofoam tray in the compartment.  Lindsay's hand and wrist were bruised and food from the tray spilled into the compartment.  Officer Fiori walked away to retrieve trash from other cells.  Id. ¶ 73.

About 5:00 p.m., Lindsay's wrist began to ache.  He asked Officer Fiori to call the medical unit for him.  Officer Fiori stated that the medical staff had not yet toured the unit and asked if it was an emergency.  Lindsay said yes.  When he explained that his wrist hurt, Officer Fiori laughed and walked away.  Id. ¶ 74.  About 8:00 p.m. Nurse Alex came to the RHU for med call.  When he gave Lindsay his seizure medication, Lindsay told him about his hand.  Nurse Alex said he would bring Lindsay Motrin.  Id. ¶ 75.  Nurse Alex brought the Motrin about 8:30 p.m.  Id. ¶ 76.

The next day, Lindsay awoke with swelling in his wrist and hand.  He continued to experience pain.  Lindsay wrote to the medical unit requesting an ace bandage.  Id. ¶ 77.  On January 1, 2019, Lindsay again wrote to the medical unit about the pain in his wrist.  He asked to have a doctor take x-rays.  Id. ¶ 78.

On January 8, 2019, Dr. Yesu toured the housing unit.  Lindsay questioned why Nurse Brennan thought he was from New Haven when that was not true.  Dr. Yesu told Lindsay that the computer records indicated he was from New Haven.  Lindsay

told Dr. Yesu that he really needed his psychiatric medications and complained that it had been thirty days since he had written to the mental health unit.  Id. ¶ 79.  Shortly thereafter, Lindsay was removed from his cell to be assessed by Dr. Yesu.  Lindsay signed an authorization for release of his health information.  Id. ¶ 80.

On January 11, 2019, Lindsay was taken to the UConn Health Center for x-rays.  He was told that the soft tissue in his wrist was bruised.  Id. ¶ 81.

On January 14, 2019, Lindsay was called to meet with Lieutenant Kelly. Escorting officer Miller handcuffed and shackled Lindsay before leaving RHU.  In the hallway, Lindsay saw John Aldi, Investigator Dousis, and Lieutenant Kelly.  The room in which they interviewed Lindsay was not private.  The door was open.  Lindsay could see an RHU worker outside the door.  The worker could hear anything said in the unit and had access to all RHU housing areas so he could relate the information to all SRG members.  Lindsay did not receive a copy of the protective custody placement review notice before the meeting.  Lindsay was nervous.  He was disappointed that Lieutenant Kelly, who had a detailed account of why Lindsay wanted protective custody, did not explain the need to the other persons present.  In response to a question by Coordinator Aldi, Lindsay stated that he would only make more enemies if he was housed in a facility with SRG units.  Id. ¶ 82.

On January 17, 2019, Lindsay submitted a request to RHU Unit Manager Cronin asking about his property.  He previously had submitted a request to Property Officer Ayotte, who said that all of Lindsay's property had been sent to RHU.  The

request to Cronin concerned pictures, letters, and medical records. Cronin directed Lindsay to again write to the property unit. Id. ¶ 83.

On January 23, 2019, Officer Greene put a white jumpsuit into the trap in Lindsay's cell door. Only SRG members wear white jumpsuits. Officer Greene told Lindsay that he had been cleared to go to an SRG unit. Lindsay said that, although he never received paperwork indicating that he was on protective custody pending status, he thought this was the case. Lindsay stated that he already had requested removal from both SRG units for safety reasons and asked to speak to Lieutenant Kelly. Officer Greene asked Lindsay if he was refusing housing. Lindsay said no, and asked Officer Greene to wait to decide whether to issue a disciplinary report until Lindsay spoke to "a higher up." Officer Greene issued the disciplinary report. Id. ¶ 84.

Lindsay felt suicidal. He thought the whole protective custody investigation was staged because Lieutenant Kelly did not have him sign any forms, and he received no information about the review process. Pursuant to Protective Management Directive 9.9, inmates seeking protective custody are entitled to a notice of the final decision of the Director of Offender Classification and Population Management regarding protective custody placement, but Lindsay never received such a notice. Warden Faucher and Deputy Wardens Cotta and Carlos walked by Lindsay's cell. Warden Faucher said that he should be out of there soon. Deputy Warden Carlos explained that the warden meant that Lindsay should be returning to an SRG unit. Deputy Warden Cotta noted that Lindsay had again refused housing. Lindsay explained his version of events to the deputy wardens. Id. ¶ 85.

The next morning Investigator Dousis came to Lindsay's cell asking him to sign the disciplinary report for refusing housing. Lindsay told Dousis that she was aware of why he was in RHU and refused to sign the ticket. Id. ¶ 86.

That evening, Lindsay's feet began to burn and itch again. He was unable to sleep. He submitted a request to the deputy wardens. Id. ¶ 87. The next day, Lindsay submitted a request to the medical unit about his feet. He had no problems with his feet before his incarceration in October 2018. Id. ¶ 88.

On January 28, 2019, Lindsay again spoke with Investigator Dousis. He asked her whether he would lose at a disciplinary hearing. She said probably yes, and he would receive double sanctions. Dousis told Lindsay that correctional officials wanted him sanctioned with loss of mail. Lindsay explained that mail was his primary contact with loved ones and that he already had problems with the mailroom. He asked her to substitute loss of visits and commissary but pleaded guilty "just to be safe." Id. ¶ 89.

On January 29, 2019, Lindsay wrote to Warden Faucher to update him on the protective custody review. Id. ¶ 90. On January 21, 2019, Lindsay was notified that the Freedom of Information Liaison was generating a request form in response to Lindsay's request for his protective custody package. Id. ¶ 91. On February 2, 2019, Lindsay completed the Freedom of Information request for his protective custody package and a form demonstrating indigency. Id. ¶ 92.

Lindsay had submitted a request to Deputy Warden Carlos about wrongful treatment in connection with the protective custody process. Lindsay received her response on February 4, 2019. Deputy Warden Carlos stated that the package had

16

been submitted and Lindsay would be informed when a decision was made. The response confused Lindsay as Deputy Warden Carlos was present when Lindsay was issued the jumpsuit for return to an SRG unit. Id. ¶ 93.

The same day, Lieutenant Michaud asked Lindsay to sign a regression form to Phase 2 of the SRG program. Lindsay did not think he should be punished for requesting safety considerations and refused to sign the form. Id. ¶ 94.

On February 5, 2019, Lindsay wrote to Warden Faucher about the regression. He again requested protective custody placement. Lindsay also filed a grievance regarding denial of due process in connection with the protective custody placement. Id. ¶ 95.

On February 7, 2019, Lindsay was transferred to Phase 2 of the SRG program at MacDougall-Walker Correctional Institution ("MacDougall-Walker"). When he entered the housing unit, other inmates began chanting "he's food." Lindsay entered his cell and went to sleep. Id. ¶ 96. The next day, Lindsay sent a request to Director Miaga asking why he had been denied protective custody placement and asking whether Miaga had received a protective custody package. Lindsay also wrote to Unit Manager Stanley requesting protective custody placement. He did not shower or attend recreation that day. Id. ¶ 97.

On February 9 and 10, 2019, Lindsay submitted requests to Unit Manager Stanley and on February 10, 2019 to Deputy Warden Roach for safety relief. Id. ¶¶ 98-99. On February 11, 2019, Lindsay did not shower or attend recreation because

he feared an attack. He remained in his cell waiting for a response from Unit Manager Stanley. Id. ¶ 100.

On February 12, 2019, Lindsay stopped Unit Manager Stanley during his tour of the unit and told him he wanted to be moved from the block. Unit Manager Stanley said he would check Lindsay's file. Lindsay also submitted a request to the mental health unit seeking medication. Id. ¶ 101.

On February 15, 2019, Unit Manager Stanley called Lindsay to his office. Stanley placed Lindsay in a single cell on No Inmate Contact Status. Id. ¶ 102.

On February 24, 2019, Lindsay wrote to Directors Santiago and Miaga, SRG Coordinator Aldi, and Commissioners Cook and Semple asking why he was placed in segregation awaiting transfer to an SRG unit upon readmission to Department of Correction custody. Id. ¶ 103. He also requested a 90-day review from Officer Fiori. Id. ¶ 104.

On February 26, 2019, Lindsay requested mental health treatment and was seen by C.S.W. Bill. C.S.W. Bill told Lindsay that he would diagnose Lindsay as suffering from post-traumatic stress disorder and would leave a note for a certified mental health nurse so Lindsay could receive psychiatric medication. Id. ¶ 105.

On February 28, 2019, Lindsay met with Dr. Zahedi and certified nurse Ostheimer. Dr. Zahedi said he would prescribe chlorpromazine for paranoia and hearing voices and mirtazapine for depression. Id. ¶ 106.

On March 1, 2019, Lindsay "was brought a Security Risk Group Member 90-Day Review," which is a form CN-61407. Id. ¶ 107. The form indicated that the

review was held on October 10, 2018.  The box on the form included Lindsay's forged signature and was dated of October 16, 2018.  Id. ¶ 107.  Later that day, Counselor Supervisor Crandall responded to Lindsay's requests to prison officials.  He stated that, pursuant to Administrative Directive 9.4, any inmate discharged while on special needs management or in the SRG program would be placed on administrative detention pending placement to appropriate housing upon readmission.  Id. ¶ 108. Lindsay replied, claiming that the directive requires that the inmate be notified.  Id. ¶ 109.

On March 8, 2019, Director Santiago responded, stating that a 90-day review was conducted to ensure that he received due process.  He noted that the SRG designation showed that Lindsay was a threat to institutional safety and security and advised Lindsay to remain discipline free.  Id. ¶ 110.

On March 8, 2019, Lindsay received his mental health medications.  Id. ¶ 111. On March 17, 2019, he wrote to the medical unit about the itching and burning sensation on his left foot.  Id. ¶ 112.

On March 24, 2019, Lindsay wrote to Director Santiago explaining that he did not have a hearing.  Id. ¶ 113.  He also wrote to SRG Coordinator Papoosha claiming that he was not shown, and did not sign, the protective custody packet.  Id. ¶ 114.

On March 28, 2019, Lindsay received his FOI request.  He determined that Lieutenant Kelly had fabricated several responses and someone had forged his signature.  Spaces for the results of Lieutenant Kelly's investigation were blank, suggesting that no investigation was conducted.  Spaces for supervisory officials to

sign off on the review also were blank.  Id. ¶ 115.  On April 2, 2019, Lindsay wrote to Warden Faucher asking that the denial of protective custody be reversed and that his protective custody packet be sent to Offender Classification and Population Management.  Id. ¶ 116.  On April 16, 2019, Warden Faucher reiterated that Lindsay was denied protective custody because there was no direct threat.  Id. ¶ 118.

On April 29, 2019, Lindsay's grievance regarding mental health treatment and medication was returned without disposition.  He was directed to re-submit the grievance as a Health Services Review.  Id. ¶ 120.

On May 5, 2019, Lindsay was called to the medical unit for the burning and itching to his foot caused by the clotrimazole cream.  Nurse Graham gave him hydrocortisone cream.  Id. ¶ 121.  The next day, after showering, Lindsay applied the hydrocortisone cream for his rash.  That night he experienced burning and itching in the area where he applied the cream.  He submitted another request for medical treatment.  Id. ¶ 122.  On May 7, 2019, a doctor prescribed two creams for impaired skin integrity.  Lindsay believes that the rash was caused by using communal shower shoes at Bridgeport and Corrigan.  Id. ¶ 123.  At med call on May 9, 2019, Lindsay refused clotrimazole cream because previously it had caused the burning sensation. Id. ¶ 125.

Lindsay alleges that he has appropriately exhausted his claims.  On April 11, 2019, Lindsay exhausted his appeal of the classification decision.  Id. ¶ 117.  On May 8, 2019, he received two level 2 grievances, one against Defendant Kelley for denying plaintiff a response regarding whether he was in protective custody pending status,

and the other against defendant Kelley for not giving Lindsay "necessary due process of any notification" of the protected custody packet and investigation. Id. ¶ 124.

Lindsay's situation improved upon his arrival at MacDougall-Walker in February 2019. The unit manager put him on "recreation alone" status. He was diagnosed with post-traumatic stress disorder, and his skin issues were treated. Id. ¶ 126.

III. **ANALYSIS**

Lindsay's allegations concern periods of incarceration at three correctional facilities: Bridgeport, Corrigan, and MacDougall-Walker. Other than a general listing of claims in the introduction, Lindsay does not elaborate on his claims or identify which defendants were involved in each claim.

Federal Rule of Civil Procedure 10(a) provides that "[t]he title of the complaint must name all the parties[.]" Lindsay lists only six defendants in the case caption: (1) former Commissioner Semple; (2) Commissioner Cook; (3) Director of Security Santiago; (4) Director of Offender Classification and Population Management Miaga; (5) Security Risk Group Coordinator Aldi; and (6) Counselor Supervisor of Population Management R. Crandall. These six persons currently are the only defendants in this case. Listing an additional sixteen persons in the body of the Complaint does not comply with Rule 10. See Shariff v. United States, 689 F. App'x 18, 1920 (2d Cir. 2017) (noting that when dismissing original complaint, district court correctly instructed plaintiff that he must identify all defendants in the case caption).

The six defendants appear to be involved in Lindsay's first claim, that he was denied due process as a pretrial detainee when he was returned to the SRG Program upon readmission to custody.

21

In November 2017, the Second Circuit considered a similar due process claim in Almighty Supreme Born Allah v. Milling, 876 F.3d 48 (2d Cir. 2017). Allah had been returned to administrative segregation as a pretrial detainee simply because he had been in administrative segregation when last discharged from custody and he had not completed the administrative segregation program by the date of his prior discharge. Id. at 52. The Second Circuit held that the defendants violated Allah's substantive due process rights because the placement was not the result of any individualized assessment of Allah's risk to the security of the facility and was therefore punitive. Id. at 56-58. However, the Second Circuit also determined that the defendants were protected by qualified immunity because reasonable officers would not have understood that following the established departmental practice of returning readmitted inmates to the status they had at the time of their prior discharge, without any individualized assessment regarding the inmate's actual risk to the security of the facility, was unconstitutional. Id. at 58-59.

After Allah, however, it is clear that such conduct violates a pretrial detainee's substantive due process rights under the Fourteenth Amendment. Lindsay was reclassified to the SRG Program as a pretrial detainee in October 2018, nearly a year after Allah was decided. Lindsay alleges that he told the admitting officer that he no longer was an SRG member but was reassigned to the program anyway. Lindsay's allegations are sufficient to state a plausible due process claim against the defendants named in the case caption.

Lindsay generally references several other claims in his introduction. The court considers the complaint to allege facts suggesting the following possible claims. First, Lindsay alleges that defendants Miaga and Aldi as well as Unit Manager Stanley, Deputy Warden Roach, Warden Faucher, Deputy Warden Carlos, Lieutenant Kelly, Investigator Dousis, Lieutenant Dumas, and Officer Messier were deliberately indifferent to his safety or failed to protect him from harm because they refused to place him in protective custody or otherwise protect him from threats from SRG members. Second, Lindsay alleges that he was subjected to unconstitutional conditions of confinement both as a pretrial detainee and a sentenced inmate based on having to use communal shower shoes, cold temperatures and cold showers, limited showers and telephone access, and being handcuffed whenever he left his cell. Lindsay refers to Officer Gargano, Lieutenant Parnishkul, Lieutenant Kelly, and Unit Manager Cronin in connection with the conditions of confinement. Third, Lindsay describes the medical and mental health care provided by Nurses Graham, Brennan and Ostheimer, Drs. Yesu and Zahedi, and C.S.W. Bill and challenges the adequacy of that treatment. Fourth, Lindsay also alleges that Officer Fiori used excessive force against him by slamming his hand in the trap in the cell door. Fifth, Lindsay alleges Lieutenant Bragdon and Officer Greene included false statements in their reports to support disciplinary charges for refusing housing. Sixth, Lindsay alleges defendant Aldi, Investigator Dousis and Lieutenant Kelly violated his right to privacy by requiring Lindsay to discuss the threats against him in a room with an open door.

Federal Rule of Civil Procedure 20(a)(2) permits the joinder of multiple

defendants in a single action if two criteria are met: first, the claims "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences"; and second, "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "What will constitute the same transaction or occurrence under the first prong of Rule 20(a) is approached on a case by case basis." Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A., 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted). As the Second Circuit has observed in the Rule 13 context,[2] whether a counterclaim arises out of the same transaction as the original claim depends upon the logical relationship between the claims and "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." Harris v. Steinem, 571 F.2d 119, 123 (2d Cir. 1978).

Lindsay's other claims arise from different occurrences or transactions and involve other correctional officers. These claims arise under different legal theories and do not contain any questions of law or fact common to the due process claim regarding readmission to the SRG program. Thus, these claims are improperly joined

---

[2] "In construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." Barnhart v. Town of Parma, 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (citation omitted).

in this action in violation of Rule 20.[3]  See Wilson v. McKenna, No. 3:12-cv-1581

(VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that

improperly joined claims must be pursued in separate actions); Fed. R. Civ. P. 21

(permitting a court to drop a party or sever a claim where the parties have been

misjoined).

All claims except the due process claim for readmission to the SRG program

are dismissed without prejudice.  If Lindsay wishes to pursue these claims, he may do

so in separate actions.

## ORDERS

This case will proceed only on the claim for denial of due process in connection

with Lindsay's readmission to the SRG program as a pretrial detainee against

defendants Semple, Cook, Santiago, Miaga, Aldi and Crandall.  All other claims are

**DISMISSED** pursuant to Fed. R. Civ. P. 20 and 21 without prejudice to Lindsay, who

may pursue these claims in separate actions.

The court enters the following orders:

---

[3] The court notes that Rule 20 is becoming increasingly important to district courts tasked with reviewing prisoners' complaints pursuant to section 1915A of title 28 of the United States Code.  As two commentators have noted:

> In the past, courts did not always pay much attention to this rule.  However, nowadays they are concerned that prisoners will try to avoid the filing fee and "three strikes" provisions of the Prison Litigation Reform Act (PLRA) by joining claims in one complaint that really should be filed in separate actions which require separate filing fees and would count as separate "strikes" if dismissed on certain grounds.

John Boston & Daniel E. Manville, Prisoners' Self-Help Litigation Manual 348 (4th ed. 2010) (collecting cases).  Indeed, if the court reviewed the Complaint striking redundant or immaterial allegations, as opposed to dismissing claims improperly joined, the plaintiff would circumvent the PLRA's "three strikes" rule and filing fee requirements.

(1)     **The Clerk shall** verify the current work addresses for defendants Semple, Cook, Santiago, Miaga, Aldi, and Crandall with the Department of Correction Office of Legal Affairs, mail waiver of service of process request packets containing the Complaint and this Order to each defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth (35) day after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshal Service on the defendant in his individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2)     **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the Complaint and this Order on defendants Semple, Cook, Santaigo, Miaga, Aldi, and Crandall in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3)     **The Clerk shall** send written notice to plaintiff of the status of this action, along with a copy of this Order.

(4)     **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5)     The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(6)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(7)     All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(8)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9)     If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the court.  Failure to do so can result in the dismissal of the case.  Plaintiff must give notice of a new address even if he is incarcerated.  Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new

address.

(10)    Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court.  Plaintiff is advised that the Program may be used only to file documents with the court.  As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.

(11)    The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Court.  The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of July, 2019.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge